**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

JERRY HOWELL,

                Plaintiff,                CASE NO. 06-CV-11841

-vs-                              PAUL D. BORMAN
                                     UNITED STATES DISTRICT JUDGE

MICHIGAN DEPARTMENT OF
CORRECTIONS,

                Defendant.
_____/

**OPINION AND ORDER
(1) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO
PLAINTIFF'S SEX DISCRIMINATION CLAIMS; AND (2) DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF'S RACE
DISCRIMINATION CLAIMS**

Before the Court is Defendant Michigan Department of Corrections' ("Defendant") April

25, 2007 Motion for Summary Judgment. (Doc. No. 11). Plaintiff Jerry Howell ("Plaintiff") filed

a Response on May 29, 2007. The Court held a motion hearing on July 26, 2007. Having

considered the entire record, and for the reasons that follow, the Court GRANTS Defendant's

Motion as to Plaintiff's sex discrimination claims; and DENIES Defendant's Motion as to

Plaintiff's race discrimination claims.

**I.      BACKGROUND**

This Title VII case arises out of Plaintiff's allegations that he was discriminated against

on the basis of race and sex in connection with his applications for various Warden positions at

Defendant. Plaintiff is a white male; this is a "reverse" discrimination case.

Plaintiff began his employment with Defendant on November 17, 1979. From June 1998 until his retirement on March 1, 2006, Plaintiff held the position of Deputy Warden at Defendant's Cassidy Lake "boot camp" facility near Chelsea, Michigan. (Compl. ¶ 5).

In 2004 and 2005, Plaintiff applied for advertised Warden positions at several of Defendant's correctional facilities throughout the State of Michigan. (Compl. ¶ 7). These correctional facilities included: (1) Oaks; (2) Muskegon; (3) Alger; (4) Ojibway; and (5) Pine River. (Compl. ¶ 9).[1] The interviews for the Musekegon and Alger positions were held at the same time. The interviews for the Ojibway and Pine River positions were held at the same time.

Defendant maintains that it fills Warden positions pursuant to its own EEO Standardized Selection Guidelines, which are intended to determine appropriate selection procedures and to prevent discriminatory employment practices. (Def. Br. Ex. 1, August 2004 EEO Guidelines; Def. Br. Ex. 2, Bridgford Dep. 54:21-25, 55:1-7). Defendant states that the process specified in its EEO Guidelines was used for all four Warden positions at issue in this case. (Def. Br. Ex. 3, Straub Aff. ¶ 10).

Under Defendant's EEO Guideline policy, when a particular correctional facility seeks to fill a position, a "selection plan" is developed and sent to Defendant's EEO office to ensure that the process is in accordance with Defendant's procedures. (EEO Guidelines, at 1-2; Bridgford Dep. 14:19-25, 15:1-5). The selection plan requires a vacancy announcement, a position description, and the resumes of interested candidates. (EEO Guidelines, at 1-2). When the Defendant's EEO office approves the selection plan, and it determines that the interested

_____

[1] Plaintiff does not claim that he was discriminated against on the basis of race or sex in connection with the Alger position.

candidates meet the minimum education and experience requirements, individual candidate interviews are scheduled. (Bridgford Dep. 18:22-25, 19:1-3).

Defendant's guidelines state that the ratings given to a candidate by the interview panel counts for 60% of the candidate's total ranking. A candidate's background/reference checks comprise the other 40% of the total ranking. (EEO Guidelines, at 2-4). However, Defendant admits that it does not "score" the background check, just the references. (Pl. Br. Ex. 21, Dingledy Dep. 16-17).

A panel interviews each candidate separately, asking the same pre-approved questions for the particular position. (Bridgford Dep. 21:13-17). Joanne Bridgford, an employee at Defendant's EEO and Recruitment Administration, states that "[i]t is common practice [at Defendant] not to have interview panel members review the background or reference check information." (Def. Reply, Ex. 1, Bridgford Aff. ¶ 12; Pl. Br. Ex. 16, Straub Dep. 16). At the end of the entire interview process, the panel discusses the candidate's responses to each of the questions and reaches a "consensus rating" for each of the candidate's responses. (*Id*. at 21:17-20). The scores on the form include Outstanding ("O"), Very Good ("VG"), Good ("G"), Adequate ("A"), and Less Than Adequate ("L"). When the interview rating forms are completed, the panel signs the consensus rating forms.

Defendant states that the interview ratings are "relative" to the other candidate's performance in the interview – i.e., if the interview panel agrees that a particular applicant performs better than others in the interviews, the candidates are then relatively, and retroactively, scored accordingly. (Pl. Br. Ex. 4, Bock Dep. 15; Bridgford Aff. ¶ 11; Straub Dep. 14-15). The panel then reaches a consensus on a particular candidate for recommendation. (Bridgford Dep.

21:20-23). Next, the interview panel sends an "appointment packet," consisting of various documents and the panel's preferred candidate to Defendant's EEO Department for approval. (EEO Guidelines, at 4; Bridgford Dep. 48:15-23). The human resources office collects the background check forms and professional references, both of which, in theory, equal 40% of the final score, although as noted before, the background check counts for nothing – all 40% is based on references. (Bridgford Aff. ¶ 12). The human resources officer then tabulates the scores from the oral interview and the background/reference forms and determines the "top three." The human resources officer then sends the results, ranked in 1, 2, 3 order to the appointing authority – in this case, the Deputy Director for Correctional Facilities Administration – for approval. The appointing authority can "select any one of the top three candidates during the selection process to fill a vacant position . . . . [and] does not have to select the candidate who scored the highest number of points during the selection process." (*Id*. at ¶ 14).

Two additional components of Defendant's interview and application process are relevant. First, for the advertised Ojibway and Pine River Warden positions, Defendant required that a candidate possess a college degree; but Defendant's Human Resources Department could approve past work experience as the equivalent of a college degree "on an individual basis." (*Id*. ¶ 18). Thus, the college degree requirement is "out the window." Additionally, under Defendant's policies, past disciplinary actions against potential candidates could only be considered if the discipline occurred in the previous two years to the date of the interview. (*Id*. at ¶ 21). Thus, the applicants for a Warden position are given a clean slate, no matter how egregious their former conduct/discipline in the MDOC system. This is incomprehensible in the context of a major promotion decision within a prison system where misconduct, in particular

abusive misconduct towards defenseless inmates, should be a major concern, even after two years.

In essence, the interview panel, with 60% of the "votes," controls the selection of the successful candidate without regard to the individual's background history, or references. This amounts to "no process": the interview panel can do whatever it wants to do for whatever reasons it likes. Defendant's Warden selection process at issue is controlled by the subjective determinations of the panel interviewers, who are kept clueless as to the candidate's background and references.[2] The oral interview conducted by the interview panel, which amounts to 60% of the final score, is determined entirely by a consensus of subjective impressions of a candidate's interview skills that day, giving determinative weight in the hiring decision to the interview panel's ranking of the candidates.

A.      Oaks Correctional Facility Warden Position (Sex Discrimination)

In November 2004, Defendant sought to fill an open Warden position at its Oaks Correctional Facility in Eastlake, Michigan. (Def. Br. 2). Plaintiff submitted an application for the position. Nine applicants sent application materials for the position, and eight of those were determined qualified for interviews. (Def. Br. Ex. 4, Dec. 10, 2004 Memo). One of the eight candidates subsequently cancelled his interview. (Def. Br. 3 n. 1).

On December 21, 2004, an interview panel consisting of Defendant's Deputy Director Dennis Straub, Regional Prison Administrator ("RPA") James MacMeekin, RPA Ray Wolfe, and RPA Barbara Bock, interviewed the seven remaining candidates, including Plaintiff. Upon completion of the interviews and background checks, the panel unanimously recommended

_____

[2] In fact, even Regional Prison Administrator Bock admitted in her deposition that the interview ratings were "subjective." (Bock. Dep. 16:8-9).

5

Cindi Curtin, a white female, for the Warden position. Curtin had received three Os and three VGs on her consensus interview panel rating form. Curtin had also served as a Deputy Warden at the Oaks facility since July 2000. (Pl. Br. Ex. 7, June 19, 2000 Letter).

Plaintiff did not finish in the top three candidates for the panel's consideration. Plaintiff's interview rating sheet included one VG, four Gs, and one A. (Def. Br. Ex. 7, Plaintiff's Interview Sheet).

On January 21, 2005, Curtin was approved as the selected candidate for the Oaks position. (Def. Br. Ex. 8, MDOC Appointment Approval Form).

**B.     Muskegon and Alger Correctional Facilities Warden Positions (Race and Sex Discrimination)**

In January and February 2005, Defendant sought to fill two additional Warden vacancies, one at the Muskegon Correctional Facility, in Muskegon, Michigan, and the other at the Alger Correctional Facility, in Munising, Michigan. Plaintiff applied for both positions. Defendant received thirteen applications for the Muskegon position, and ten of those qualified for the interview. (Def. Br. Ex. 9, Feb. 2, 2005 Memo). Defendant received ten applications for the Alger position, and eight of those qualified for interviews. (Def. Br. Ex. 10, Feb. 14, 2005 Memo). Qualified candidates were allowed to interview for both positions.

On February 17, 2005, an interview panel consisting of Straub, MacMeekin, Wolfe, and Bock – the same panel as for the Oaks position – interviewed eleven candidates for the Muskegon position and eleven candidates for the Alger position. (Def. Br. Ex. 11, Final Applicant Pool Listing). Those candidates applying for both positions were interviewed for both positions at the same time.

Following the interview and background/references checks, the interview panel

unanimously selected Shirlee Harry, a black female, for the Muskegon position. Harry placed in the top three candidates in the interviews, and received one O and five VGs on her interview rating sheet. She also scored well in her background/reference checks. (Def. Br. Ex. 12, Interview Panel's Recommendation & Interview Score Sheet). Harry had served as a deputy warden at the Brooks Correctional Facility in Muskegon Heights, Michigan, from July 2000 to July 2003. She was employed with the Michigan Youth Correctional Facility in Baldwin, Michigan, from July 2003 to the date of her hire as Warden. (Pl. Br. Ex. 8, Harry Resume).

The panel recommended David Bergh, a white male, for the Alger position. (Def. Br. Ex. 13).

Plaintiff was not in the top three scoring candidates for either position, receiving four As, with only two Gs on his consensus interview panel rating form. (Def. Br. Ex. 14, Plaintiff's Interview Sheet).

On March 10, 2005, Harry and Bergh were approved as the selected candidates for the Muskegon and Alger positions, respectively. (Def. Br. Ex. 15, MDOC Appointment Approval Form).

### C. Ojibway and Pine River Correctional Facilities Warden Positions (Race Discrimination)

In April 2005, Defendant sought to fill two additional Warden vacancies, the first at the Ojibway Correctional Facility in Marenisco, Michigan, and the other at the Pine River Correctional Facility in St. Louis, Michigan. Eight individuals applied for the Ojibway position, and seven of those qualified for the interview. (Def. Br. Ex. 16, Apr. 7, 2005 Memo). Eventually, only six individuals interviewed. Fifteen individuals sent applications for the Pine River position, and fourteen of those qualified for the interview. (Def. Br. Ex. 17, Apr. 6, 2005 Memo).

Only thirteen ended up interviewing for the position.

On April 21 and 22, 2005, an interview panel consisting of Straub, MacMeekin, Wolfe, and Joanne Bridgford, Defendant's EEO and Recruitment Administrator, interviewed the six candidates for the Ojibway position and thirteen candidates for the Pine River position. (Def. Br. Ex. 18, Final Applicant Pool Listing). Those candidates applying for both positions interviewed for both positions at the same time.

Following the interview and the background/reference checks, the panel unanimously recommended Jeffery White, a black male, for the Ojibway position. White had placed in the top three candidates after the interview, receiving four Os, and one VG on his consensus interview panel form. (Def. Br. Ex. 19). White also scored well in background/reference checks. White had previously served since 2002, as a deputy warden at the Mound Correctional Facility in Detroit, Michigan. (Pl. Br. Ex. 9, White Resume). White did not have a college degree at the time of his interview.

Plaintiff submits, and Defendant does not contest, that during Plaintiff's tenure as Deputy Warden of the Cassidy Lake boot camp, White had been suspended in 1994 for twenty days, demoted, and transferred for assaulting prisoners at the facility. (Pl. Br. Ex. 11, MDOC Complaint Against Employee Form; Pl. Br. Ex. 12, Dec. 21, 1994 Letter). Under Defendant's EEO procedures, this significant episode more than two years previous, was totally shielded from the decisionmakers..

The panel also unanimously recommended Percy Conerly, a black male, for the Pine River position. Conerly was in the top three interview candidates, receiving three Os, one VG, and one G+, with a comment alongside reading "very good communication with staff – needs to

focus on public speaking." (Def. Br. Ex. 20). Conerly similarly received excellent marks on his references. Conerly served as a deputy warden at the St. Louis Correctional Facility from October 2002 to August 2003, and then after that at the Mid-Michigan Correctional Facility. (Pl. Br. Ex. 10, Conerly Resume). Conerly similarly did not hold a college degree.

Plaintiff was not rated within the top three interview candidates, and scored five Gs on his consensus interview panel rating form. (Def. Br. Ex. 21, Plaintiff's Interview Sheet).

On May 6, 2005, White was approved as the selected candidate for the Ojibway position. (Def. Br. Ex. 22, MDOC Appointment Approval Form). On May 16, 2005, Conerly was approved as the selected candidate for the Pine River position. (*Id*.).

### D.    Plaintiff's EEOC Claim

On September 9, 2005, Plaintiff filed reverse discrimination claims with the EEOC on the basis of race and of gender, because of his failure to be promoted to any of the four Warden positions with Defendant. (Def. Br. Ex. 23, Sept. 9, 2005 Letter). Plaintiff claimed that he was more qualified than three of the selected candidates, and at least as qualified as Harry. He also claimed that one of the panel members at the Ojibway/Pine River fell asleep during the interview. (*Id*.).

On December 21, 2005, the EEOC sent Plaintiff a letter explaining that it was discontinuing the processing of his charge. (Def. Br. Ex. 25, Dec. 21, 2005 Letter). On January 18, 2006, the EEOC issued Plaintiff a right to sue letter. (Compl. Ex. A).

In March 2006, Defendant retired from his Deputy Warden position at Defendant. (Def. Br. Ex. 26, Howell Dep. 5:21-23). Plaintiff maintains that as a result of his failure to obtain one of the four posted Warden positions, he became "frustrated and disillusioned with Defendant and

retired from his employment . . . . on March 1, 2006, was thereby constructively discharged."

(Compl. ¶ 14; Howell Dep. 14:9-25, 15:1-7).

In June 2006, Plaintiff took a position as an Associate Warden of Programs at the

Southern Nevada Corrections Facility. (Howell Dep. 20:1-5, 22:10-13). He is presently

employed at that position.

### E.    The Instant Suit

On April 18, 2006, Plaintiff filed the instant suit alleging the following causes of action:

| Count I:   | Title VII Race Discrimination (Muskegon, Pine River, Ojibway) |
| Count II:  | Title VII Sex Discrimination (Oaks and Muskegon) |
| Count III: | Elliot Larsen Civil Rights Act Race Discrimination (state law) |
| Count IV:  | Elliot Larsen Civil Rights Act Sex Discrimination (state law) |

On April 25, 2007, Defendant filed a Motion for Summary Judgment. Defendant argues

that Plaintiff has not shown: (1) direct or indirect evidence of race or sex discrimination; and (2)

that Defendant's legitimate, non-discriminatory reasons for its decision are a pretext for

discrimination.

Plaintiff contends that he has presented both direct and indirect evidence of race and sex

discrimination. His proffered direct evidence of racial discrimination includes: (1) remarks made

by Deputy Director of Field Operations Dennis Schrantz's while supervising a Warden's

meeting, at which Plaintiff attended, that the department needed more blacks and that the

department was going to "correct that"; and (2) White's alleged remarks to other MDOC

employees, before the interviews had taken place, that he was going to get the Ojibway position.

Plaintiff's indirect evidence of discrimination includes: (1) Plaintiff's contention that he had

better background references than Conerly, White, and Harry; (2) the fact that White and

Conerly lacked college degrees; (3) the fact that the background checks were not scored by Defendant; (4) the huge variance in interview scores for a particular candidate – White in particular – from interview to interview; (5) the fact that the position description for Ojibway and Pine River did not match the Selection Criteria used by the interviewers for the position – suggesting that that criteria were purposefully tailored to match the strengths of White and Conerly; (6) Plaintiff's testimony that on previous occasions he had been directed to hire Straub's son for a field service assistant position for which he was not qualified and on another occasion was instructed to give a sergeant's job to an unqualified black male; (7) Plaintiff's own observations that it was "well-known" at MDOC that females and blacks are favored for promotions; and (8) the fact that interviewer Wolfe fell asleep for the last third of Plaintiff's interview for the Ojibway and Pine River positions.

For the following reasons, the Court finds that the evidence presented to the Court, taken in the light most favorable to the non-moving party, creates a genuine issue of material fact on whether Plaintiff's failure to obtain a Warden position at Ojibway and Pine River was a result of race discrimination. However, the Court finds that Plaintiff's arguments do not establish a genuine material fact issue as to his race and sex discrimination claims in connection with the Oaks and Muskegon positions.

## II.      ANALYSIS

### A.      Title VII Reverse Race and Sex Discrimination Standards

The United States Court of Appeals for the Sixth Circuit has recently summarized the appropriate legal analysis for a "failure to promote" Title VII sex and race discrimination claims based upon a claim of "reverse discrimination."

> To set forth a prima facie case of discrimination based on a failure to promote, plaintiffs must show: (1) they are members of a protected class; (2) they applied and were qualified for promotion; (3) they were considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions. Additionally, in cases of "reverse discrimination" where, as here, plaintiffs are not members of a protected class, this court has held that the plaintiff must demonstrate "background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority."
>
> Once plaintiffs establish a prima facie case of discrimination, the burden then shifts to the defendants to articulate some legitimate, nondiscriminatory reason for the defendants' action. If the defendants carry this burden, plaintiffs must prove that the legitimate reasons offered by defendants were in fact a pretext for discrimination. A plaintiff establishes pretext by showing that the reason offered by the defendant: (1) has no basis in fact; (2) did not actually motivate the decision not to promote; or (3) was insufficient to warrant the decision not to promote.

*Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719-20 (6th Cir. 2006) (internal citations omitted). "To satisfy the fourth prong in a reverse-discrimination case, the plaintiff must show that the defendant treated differently employees who were similarly situated but were not members of the protected class." *Leadbetter v. Gilley*, 385 F.3d 683, 690 (6th Cir. 2004).

A plaintiff may establish a prima facie case "by presenting direct evidence of intentional discrimination by the defendant, or by showing the existence of circumstantial evidence which creates an inference of discrimination." *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995). "The [burden shifting] framework applies only when discrimination plaintiffs rely on circumstantial evidence to prove their claims." *Lindsay v. Yates*, – F.3d –, 2007 WL 2316626, *4 n.7 (6th Cir. 2007).

"The prima facie requirement for making a Title VII claim is not onerous, and poses a burden easily met. The prima facie phase merely serves to raise a rebuttable presumption of discrimination by eliminat[ing] the most common nondiscriminatory reasons for the [employer's

treatment of the plaintiff]." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir.

2000) (internal citations and quotations omitted).

### B. Prima Facie Case

#### 1. Direct Evidence

Defendant argues that Plaintiff has not presented any direct evidence of discrimination.

Direct evidence of discrimination "is that evidence which, if believed, requires the conclusion

that unlawful discrimination was at least a motivating factor in the employer's actions."

*Laderach v. U-Haul of Nw. Ohio*, 207 F.3d 825, 829 (6th Cir. 2000). "Consistent with this

definition, direct evidence of discrimination does not require a factfinder to draw any inferences

in order to conclude that the challenged employment action was motivated at least in part by

prejudice against members of the protected group." *Johnson v. Kroger Co.,* 319 F.3d 858, 865

(6th Cir. 2003). "In direct evidence cases, once a plaintiff shows that the prohibited classification

played a motivating part in the employment decision, the burden of both production and

persuasion shifts to the employer to prove that it would have [taken adverse action against] the

employee even if it had not been motivated by impermissible discrimination." *Nguyen v. City of

Cleveland,* 229 F.3d 559, 563 (6th Cir. 2000).

Plaintiff's proffered "direct evidence" includes: (1) an alleged remark made by Dennis

Schrantz, Deputy Director of the MDOC; and (2) the remarks to him by Russ Marlin and Linda

Tribley that the successful applicant Jeffrey White, an African-American male, told these two

individuals in advance of his selection that White would be selected for the position.

Plaintiff testified as follows on the Schrantz issue:

A:      I sat in with a meeting with Denny – Dennis Schrantz, who is the *deputy
        director of field operations* for the Michigan Department of Corrections, and

13

at the time I was the acting warden so I was on their management team and I was in a room with all other managers and he told us that there were not enough black people in management and that they were going to correct that.

. . . .

Q:     And was Mr. Schrantz involved in any promotion to warden that you sought?

A:     No.

. . . .

Q:     And did he indicate how they were going to correct this perceived problem with not enough African Americans?

A:     Well, no he didn't have to.

Q:     What do you mean by that?

A:     Well, because everyone understands how you do it, you – because that's who [sic] you would promote.

. . . .

Q:     Mr. Schrantz, does he hold supervisory authority over any of the individuals involved in awarding the wardens' positions that you're challenging in this case?

A:     No.

(Howell Dep. 92:4-12, 22-24; 93:9-16; 94:9-13) (emphasis added).

Plaintiff testified on the Marlin and Tribley issues:

A:     The fact that [White] told Russ Marlin, who is the public information officer for the Department of Corrections, that [White] was going to get the job prior to the interview. He also told Linda Tribley, who is a deputy warden I think at Newberry, prior to the interviews that he was going to get the job.

. . . .

A:     And [White] told [Marlin] that [White] was going to get the job because if a black male worked in the [Upper Peninsula], did any time up there, that they would reward him with a warden's job when it came available.

(*Id*. at 62:12-18, 22-25; 63:1). Plaintiff admitted that neither Marlin nor Tribley had any decision-making roles in the Ojibway position. (*Id*. at 63:4-9). Plaintiff further stated that White never made the statements to Plaintiff himself. (*Id*. at 63:14-16). Plaintiff testified that Marlin told Plaintiff about White's statements, and that Plaintiff did not know from whom Tribley heard White's alleged statements. (*Id*. at 63:17-22; 65:5-9).

Defendant maintains that this evidence is: (1) not relevant to Plaintiff's discrimination

claim because these individuals did not have authority over the decision-making process; and (2) inadmissible as hearsay.

The Sixth Circuit has held that statements indicating racial or sexual bias by non-decisionmakers do not suffice, in themselves, to satisfy a plaintiff's burden to demonstrate bias. *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000). "In assessing the relevancy of a discriminatory remark, [the court] look[s] first at the identity of the speaker." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354 (6th Cir. 1998). The relevancy of a management employee's discriminatory remark is not limited only to the individual with direct authority over the plaintiff's employment decision, but also to those who "play[ ] a meaningful role in the decision," "may have influenced the decision," or to those "in a position to shape the attitudes, policies, and decisions of the [decisionmakers.]" *Id*. at 355; *see Taylor v. Bd. of Educ. of the Memphis City Schs*, No. 05-6460, 2007 WL 2031448, *2 (6th Cir. July 13, 2007) (unpublished).

Defendant argues that although Schrantz was a high-ranking MDOC official, he had no authority over the immediate decision-making process for the various Warden positions. Schrantz allegedly made this remark at a meeting of Wardens when he was a Deputy Director for Field Operations – and, per Defendant, there is no link to whether this alleged commentary had any impact on, or any relevance to, Plaintiff's application for Warden positions at some later date. Defendant further maintains that "Warden positions are under the [Defendant's] Correctional Facilities Administration, which is not part of Mr. Schrantz's oversight responsibilities." (Bridgford Aff. ¶ 10).

The Court finds that Schrantz's statements are relevant to possible racial bias at Defendant. Although Schrantz did not have formal authority over the Warden positions at issue, his high-ranking position of Deputy Director of Field Operations at Defendant where he presided over a meeting of all Wardens, combined with the substance of his alleged statement discussing MDOC policies in general and the context in which it was made, certainly creates an issue of material fact, under *Ercegovich*, whether Schrantz's verbalized attitude on the issue of promoting more African-Americans may have "influenced" the Warden selection process or was "in a position to shape the attitudes, policies, and decisions" of the interview panel. *See, e.g., Ercegovich*, 154 F.3d at 355 ("When a major company executive speaks, everyone listens in the corporate hierarchy"). Additionally, White's alleged statements to Marlin and Tribley, that White was going to get the Ojibway position supports Plaintiff's contention that Defendant's interview process was a subterfuge to select predetermined candidates based on racial considerations.

Defendant maintains further that even if these statements are relevant, they are hearsay, and thus cannot be introduced in Plaintiff's trial. As to the introduction of Schrantz's statement, Plaintiff contends that Schrantz's is admissible as non-hearsay under Fed. R. Evid. 801(d)(2)(D).

Hearsay evidence cannot be considered on summary judgment. *Jackson v. Schering Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999). Rule 801(d)(2)(D) provides that a statement is not hearsay if is constitutes "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." The Sixth Circuit has noted that the inquiry into the relevance of such alleged statements is often coterminous with the hearsay issue. *Carter v. Univ. of Toledo*,

349 F.3d 269, 275 (6th Cir. 2003) ("Whether a statement qualifies are nonhearsay under Rule 801(d)(2)(D), therefore, goes beyond simply determining if the declarant is a direct decision-maker with regard to the adverse employment action"). A declarant need not have a "personal involvement" requirement in a specific employment decision under Rule 801(d)(2)(D). *Id*. at 276 (citing *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 950 (7th Cir. 1998)).

Here, Schrantz's statement was made at a meeting of MDOC Wardens, where he did have managerial authority over Plaintiff and other Wardens present. Schrantz's statement, in context, that "they" (presumably Defendant) were going to address the perceived deficiency of African-Americans in management positions strongly implies that "[Schrantz's] opinion of [Defendant's] policy concerned a matter within the scope of his authority[.]" and that he was relaying his understanding of Defendant's policies. *Marra v. Philadelphia Housing Auth.*, – F.3d –, 2007 WL 2215603, *7 (3d Cir. 2007) (following the Sixth Circuit's reasoning in *Carter*).

Plaintiff's testimony as to the relay by Marin and Tribley of White's alleged statements appears to be inadmissible hearsay. Neither party makes any substantive argument on this point. Therefore, the Court will not utilize these statements in reaching its decision on the instant motion. *See Jackson*, 176 F.3d at 927; Fed. R. Civ. P. 56(d) & (e). This preliminary ruling on the instant motion does not establish "law of the case" with regard to limiting the parties' ability to raise this issue, in limine, prior to the trial.

2.      Circumstantial Evidence

Defendant argues that Plaintiff cannot satisfy the second and fourth prongs of the prima facie case for his discrimination claims. In particular, Defendant argues that Plaintiff was not

"qualified for the promotion," thus failing the second prong of the "failure to promote" prima facie case.

Initially, the Court finds that Defendant's argument on the second prong – that Plaintiff was not qualified for the position – is not convincing. "When assessing whether a plaintiff is qualified at the prima facie stage, courts must examine the plaintiff's evidence independent of the nondiscriminatory rationale produced by the defense." *Cline,* 206 F.3d at 660-61.

Defendant simply points to the fact that Plaintiff's interview scores were ultimately lower than the successful candidates, and asserts that the other candidates were "better qualified." (Def. Br. 11-12). Defendant's argument ignores the reality that the interview scores – the determinative (60%) event in the promotion under Defendant's scheme – did not take into account much of the "real world" of the candidates – employment and educational background and disciplinary records. Bock and Wolfe, who served on the interview panel for several of the Warden positions, stated that "[Plaintiff] was well qualified for the position, no question." (Pl. Br. Ex. 4, Bock Dep. 17:21; Pl. Br. Ex. 6, Wolfe Dep. 18:23-25). Therefore, the Court finds that Plaintiff has met his evidentiary burden for demonstrating the second prong the prima facie case. *See Lindsay*, 2007 WL 2316626, at *4.

In a reverse discrimination case, the Sixth Circuit has explained the requirement for Plaintiff's proofs on the "similarly-situated" fourth prong:

> "In order for two or more employees to be considered similarly-situated for purposes of creating an inference of disparate treatment in a [reverse discrimination case], the plaintiff must prove that all of the relevant aspects of his employment situation are 'nearly identical' to those of the [female employee] who he alleges [was] treated more favorably." The similarities between the plaintiff and the female employee must exist "in all *relevant* aspects of their respective employment circumstances." Differences in job title, responsibilities, experience, and work record can be used to determine whether two employees are similarly situated.

*Leadbetter*, 385 F.3d at 691 (internal citations omitted) (emphasis added).

Defendant argues that Plaintiff was not similarly situated as the four ultimately successful Warden candidates. Defendant focuses upon the relative work experience and interview performance of Plaintiff versus the successful candidates.

Curtin, who obtained the Warden position at the Oaks Facility, received a college degree in criminal justice from Michigan State University in 1985. (Def. Br. Ex. 6, Curtin's Application Materials). After working in a variety of lower-level positions at Defendant, Curtin had been Deputy Warden at various facilities since July 2000. (Pl. Br. Ex. 7; Def. Br. Ex. 6). In July 2000, Curtin took an Assistant Deputy Warden position at the Camp Pellston Facility. In that position, she supervised 36 staff members and 140 prisoners, and was responsible for, inter alia, the safety of the community, budgetary requirements, and personnel decisions. (Def. Br. Ex. 6). After that, Curtin took a position as Assistant Deputy of Operations at the Riverside Correctional Facility. There she was responsible for supervision of all of the housing and custody areas, including over 1,100 prisoners and 300 staff members. At the time of her interview at the Oaks Facility in 2005, Curtin was the current Deputy Warden at that same facility. There, she was responsible for the housing and custody areas, supervision of over 1,100 prisoners and 345 staff members, personnel management, workplace compliance, and union negotiations, among other duties.

Curtin also received a "high performing" job rating on her background check form. (*Id*.). Curtin's references included: (1) David Gundy, the Warden of the Oaks Facility; (2) Kurt Jones, Warden of the Carson City Correctional Facility; and (3) Kenneth McKee, Warden of the Bellamy Creek Correctional Facility. (*Id*.). Gundy's reference provided a VG rating overall. Jones gave her Os in all categories, remarking: "Would be a better warden than I ever thought of

being." (*Id*.). McKee also provided Os in all categories, stating "She is ready for the next level of being a Warden. She will succeed and do the department well." (*Id*.).

Shirlee Harry, who obtained the Muskegon Facility Warden position, had a college degree and, at the time of her interview, was a few credits short of a master's degree. (Def. Br. Ex. 12, Harry's Application Materials). Harry began working for Defendant in 1984. In July 1999, Harry became the Acting Deputy Warden at the Brooks Correctional Facility in Muskegon Heights, Michigan. From July 2000 to July 2003, she served as the Deputy Warden for the facility. In that role, among other duties, Harry administered the custody department, served as chairperson for the security classification committee, was responsible for all movement of prisoners, oversaw the budget, maintained the disciplinary hearing system, and assumed overall administrative responsibilities when the Warden was absent. (*Id*.). From July 2003 until her hire as Warden, Harry served as Contract Monitor for the Michigan Youth Correctional Facility ("MYC"). (*Id*.). In that position, Harry was appointed by Defendant to ensure that the MYC complied with Defendant's contracts and policies and to coordinate actions and communications between Defendant and the facility. (*Id*.).

Harry's background check form indicated that her job performance was "meets expectations." (*Id*.). Harry's references included: (1) Barry McLemore, Deputy Director of the MYC; (2) Mary Berghius, Warden of the Brooks Correctional Facility; and (3) Carol Howes, Warden of the Florence Crane/Lakeland Correctional Facility. McLemore gave Harry all O ratings on her reference form, and indicated that she "is eminently qualified and capable of performing the duties of a Warden in an excellent manner." (*Id*.). Berghius also gave Harry all O ratings. Howes gave Harry all Os and two VGs. (*Id*.).

Jeffrey White, who obtained the Ojibway Facility Warden position, had taken some university courses but had not earned a college degree. White began working at Defendant in 1987. (Def. Br. Ex. 19, White's Application Materials). In his early years, he had worked for Plaintiff. Thereafter, White served as the Assistant Deputy Warden for Custody at the Mound Correctional Facility from September 2001 to January 2002. (*Id*.). From January to March 2002, he served as an Assistant Deputy Warden for Housing and Programs at the Ojibway Facility. (*Id*.). From March to August 2002, White served as Assistant Deputy Warden for Custody at the Newberry Correctional Facility. (*Id*.). From August to November 2002, White returned to his previous position as Assistant Deputy Warden for Custody at the Mound Correctional Facility. (*Id*.). In November 2002, he was promoted to Deputy Warden, or second-in-command, to the Warden. (*Id*.).

White's background check form indicated a "satisfactory" job performance rating. (*Id*.). White's references included: (1) Andrew Jackson, Warden of the Mound Correctional Facility; (2) Harold White, Warden of the Parnall Correctional Facility; and (3) Terry Sherman, Warden of the Ojibway Correctional Facility. Jackson gave White all Os on the reference check form. Harold White similarly gave White all Os. Sherman scored White with all Os and one VG, commenting that White "would be a very good warden." (*Id*.).

Percy Conerly, hired for the Pine River Facility position, did not have a college degree at the time of his interview. (Def. Br. Ex. 20, Conerly Application Materials). Conerly had worked for Defendant in various positions since 1987. Conerly served as an Assistant Deputy Warden in various units at the Carson City Correctional Facility from July 1995 until October 2002. (*Id*.). Conerly took a position as Deputy Warden at the St. Louis Correctional Facility from October

2002 until August 2003. (*Id.*). In August 2003 until his hire at Pine River, he took a position as Deputy Warden at the Mid-Michigan Correctional Facility. (*Id.*).

Conerly's background check form reveals that his job performance rating was "meeting expectations." (*Id.*). Conerly listed the following references: (1) Paul Renico, Warden of the St. Louis and Mid-Michigan Correctional Facilities; (2) Kurt Jones, Warden of the Carson City Facility; and (3) Cindi Curtin, the then newly-appointed Warden of the Oaks Facility. Renico gave Conerly all Os, and stated that "Deputy Conerly would make an excellent warden." Jones scored Conerly with all Os and two VGs. Curtin gave Conerly all Os, and commented that Conerly "would be an excellent Warden." (*Id.*).

Plaintiff had been working at Defendant since 1979. (Howell Dep. 6:16-18). Since 1998, Plaintiff had served as Deputy Warden for the boot camp facility. (*Id.* at 12:12-14).

Plaintiff's background check form from the Oaks Facility application process indicated that he received "high performing" ratings at Cassidy Lake for 2002 and 2003, with 2004 "not yet available." (Pl. Br. Ex. 2, Jan. 3, 2005 Background Check Form). The human resources manager of Cassidy Lake, John McCoskey, indicated that "with 25 [Plaintiffs] you could run the entire department." (*Id.*). Plaintiff also submits that background check form in connection with the Ojibway & Pine River positions, which also indicated a "high performing" job rating. (Pl. Br. Ex. 3, May 3, 2005 Background Check Form). That background check form phone call was dated May 3, 2005 – the same day that the interview panel unanimously recommended White for the Ojibway Warden position.

Plaintiff also submits two of his reference check forms. The first reference, from Bruce Curtis, Plaintiff's supervisor at Cassidy Lake, scored Plaintiff with all Os and one VG, stating

that "[y]ou could not find a better person to run a prison." (Pl. Br. Ex. 14, Jan. 6, 2005 Reference Check Form). The second reference, from David Medley, a human resources manager, provided Plaintiff with all Os, and remarked that "[Plaintiff] distinguishes himself from the rest. He is great beyond reservation." (Pl. Br. Ex. 15, Apr. 29, 2005 Reference Check Form).

For the purposes of the determining whether a plaintiff has established the fourth prong of the prima facie case for a reverse discrimination claim, "[t]he plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered similarly situated; rather . . . . the plaintiff and the employer with whom the plaintiff seeks to compare himself or herself must be similar in all the *relevant* aspects." *Ercegovich*, 154 F.3d at 352 (internal citations and quotations omitted) (emphasis in original).

The record indicates that although Plaintiff and the successful Warden applicants were similarly classified as Deputy Wardens at Defendant, Plaintiff's responsibilities at Cassidy Lake were not precisely the same type of duties performed by the other successful candidates. Whereas Plaintiff's most recent employment was at a boot camp, a minimum security facility where prisoners and probationers would serve a period of 90 days, the other candidates had worked as Deputy Wardens at larger facilities, similar in size and organization to those correctional institutions for which they were applying.

Nevertheless, the Court finds that Plaintiff was similarly situated to the ultimately successful candidates for the promotion. Plaintiff enjoyed the same job classification as Deputy Warden, and had worked longer at Defendant than the other candidates, including employment at the larger facilities. Defendant's supervisors have admitted several times in the record that Plaintiff was certainly qualified to be a Warden at the correctional facilities in question.

23

Similarly, the Warden position selection criteria for the open positions did not require that a candidate have any particular type of correctional facility experience.[3] In sum, taking the facts in the light most favorable to the non-moving party, Plaintiff had the same relevant job title, similar responsibilities, experience, and work record as the other successful candidates. Therefore, the Court finds that Plaintiff was similarly situated for the purposes of the fourth prong.

Finally, in a reverse discrimination case, a plaintiff must show "background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Grizzell,* 461 F.3d at 719.[4] "To satisfy the burden of demonstrating [these background circumstances], the plaintiff may present evidence of the

---

[3] Defendant implies that since Plaintiff lacked Correctional Facility Administration ("CFA") experience, he was not "similarly situated" for the purposes of the prima facie case. Curtis, Plaintiff's supervising warden at the boot camp facility, explained that for a position as Warden, Plaintiff lacked relevant CFA experience, as opposed to Fields Operations Administration (Def. Ex. 30, Curtis Dep. 29-30). Plaintiff further admitted that he had not worked at a prison other than a boot camp since 1988. (Howell Dep. 53:8-11). Curtis additionally had recommended that Plaintiff, when he did not get one of the Warden positions, take a Deputy Warden position at the Cooper Street Correctional Facility to gain more CFA experience. (*Id.* at 30:9-16). Plaintiff did not end up doing so. The Court finds that Defendant's contention here is a post-hoc rationalization that was not considered at the time of Plaintiff's interviews. Even Curtis himself admitted that "Plaintiff would make a good Warden." (Curtis Dep. 27:14-18).

[4] Several Sixth Circuit panels have expressed reservation about the "background circumstances" imposing a "heightened pleading standard" upon reverse discrimination plaintiffs. *See, e.g., Zambetti v. Cuyahoga Cmty College,* 314 F.3d 249, 257 (6th Cir. 2002); *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 801 n. 7 (6th Cir. 1994).

The Sixth Circuit has recognized that under Michigan law, ELCRA claims are governed by the same burden-shifting analysis as federal Title VII cases. *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999).

Michigan law no longer requires that a reverse discrimination plaintiff must satisfy the "background circumstances" prong of the prima facie case. *See Lind v. City of Battle Creek*, 470 Mich. 230, 232-34 (2004). Thus, even if the instant Plaintiff fails to prove the Sixth Circuit's heightened pleading requirement, his state ELCRA claim can proceed.

defendants' unlawful consideration of race in employment decisions in the past." *Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 603, 615 (6th Cir. 2003).

Plaintiff's proffered evidence on this point appears to consist of: (1) four out of five positions for which he applied were awarded to women and African-Americans; (2) his past personal experience of being ordered to hire a Straub's son, a white male, and an unqualified black male for a sergeant position (Howell Dep. 99-100); and (3) his own personal experience working in hiring employees for fifteen years (*Id*. at 90-92). Defendant responds that since July 2003, Defendant has hired eighteen wardens. (Bridgford Aff. ¶ 23). Of those eighteen, eight were Warden transfers from other facilities. Of the remaining ten appointments, seven were given the males and three to females; seven out of ten were white, and the other three were black. (*Id*.). The available statistics in the number of Wardens hired here is not so large as to provide meaningful statistical evidence with regard to this ruling.

The Court finds that Plaintiff's arguments establish the appropriate "background circumstances." Plaintiff has introduced testimony relating to the comments of Schrantz, a high-ranking official, acting Director of Field Operations at MDOC that Defendant was seeking to place more African-Americans in managements positions. Plaintiff also offers his personal observations about Defendant's hiring practices, and a particular incident where he was instructed to give a job to an unqualified black male. Plaintiff also raises the issue of statements by White to other MDOC employees, in advance of the job interviews, that White was going to get the Warden position. The Court leaves for trial, in limine determination, whether such evidence is admissible. Finally, of great significance is the lack of objective standards utilized by

Defendant in its promotion process, whereby interviews, day by day, with no connection to each other, control (60%) the promotion decision.

Thus, the Court finds that Plaintiff has satisfied his prima facie case as to his race and sex discrimination claims.

### C.     Defendant's Articulation of Legitimate, Non-Discriminatory Reasons

Once plaintiffs establish a prima facie case of discrimination, the burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the defendant's action. If the defendants carry this burden, a plaintiff must prove that the legitimate reasons offered by defendants were in fact a pretext for discrimination. A plaintiff establishes pretext by showing that the reason offered by the defendant: (1) has no basis in fact; (2) did not actually motivate the decision not to promote, or (3) was insufficient to warrant the decision not to promote. *Grizzell*, 461 F.3d at 420.

The Sixth Circuit has adopted the following analysis when evaluating a plaintiff's claims that subjective criteria matrices mask illicit discrimination:

> Several courts, moreover, have held that employers may use matrices that reward applicants who meet subjective criteria. Although [Plaintiff] argues that "there were no underlying or documentary bases to support the objectivity of the matrix [ ] . . . . other than the selecting official's testimony," this subjectivity, without more, does not establish pretext. So even though the matrix scores were "susceptible to subjective determinations," the district court in *Brown* concluded that the matrix was irrelevant to the pretext inquiry in the absence of a showing that the matrix inaccurately measured job skills or that the matrix was used as a pretext to mask discrimination. Similarly in *Senner v. Northcentral Technical College*, the Seventh Circuit held that using a matrix with subjective criteria was acceptable:
>
> > [Plaintiff's] most persuasive argument is that the rating criteria were too subjective. . . . The result . . . . is that the assessors could readily manipulate the results. . . . The problem is that these arguments, even when construed most favorable toward [Plaintiff], only show that [Defendant] did not give his credentials the emphasis [that] they may

have deserved. . . . [Plaintiff] has shown, at best, that [Defendant's] evaluation criteria require a subjective judgment; they do not suggest that discriminatory intent affected that judgment.

*Browning v. Dep't of Army*, 436 F.3d 692, 697 (6th Cir. 2006) (internal citations omitted).

In this case, Defendant's stated reasons are: (1) Plaintiff did not perform as well in the interviews as the successful candidates; and (2) Plaintiff lacked relevant CFA experience.

To demonstrate that Defendant's stated reasons are pretext, Plaintiff points out that: (1) Schrantz made comments at a Warden's meeting that Defendant was seeking to remedy the deficiency of African-Americans in management positions; (2) Plaintiff had significantly higher ratings on his background checks than White and Conerly; (3) Plaintiff had more experience at Defendant than either White or Conerly; (4) the interview panels gave inconsistent results for the same candidates in different interviews; (5) the Ojibway and Pine River position descriptions did not match the selection criteria, and were most likely tailored to match the perceived strengths of White and Conerly; and (6) interviewer Wolfe, the only African-American on the interview panel, fell asleep during the last third of Plaintiff's interview for the Ojibway and Pine River positions. Per Plaintiff, this evidence combined with the subjective nature of the interview process, and the determinative weight given to that subjective component of a candidate's application, provide a reasonable inference that Defendant had reverse discriminatory motives in hiring White and Conerly.

Initially, the Court has discussed above the implication of Schrantz's alleged remarks. The Court finds that those statements support an inference that Defendant was actively seeking to place African-Americans in supervisory positions.

Plaintiff next proffers that his background check scores were significantly higher than

27

both Percy and Conerly. Plaintiff submits two background check forms – the first in connection with the Oaks position dated January 3, 2005, and the second from the Ojibway/Pine River position dated May 3, 2005. The January 3 background check form indicates that Plaintiff's "Annual Ratings" for 2002 and 2003 were "High Performing," with the 2004 rating not yet available. (Pl. Br. Ex. 2). Plaintiff's May 3 form indicates a "High Performing" job rating. (Pl. Br. Ex. 3). On the other hand, Conerly's May 3 background check form provides only a "Meeting Expectations" rating. (Pl. Br. Ex. 28). White's February 23, 2005 background check, apparently from the Muskegon/Alger positions shows only a "Satisfactory" rating. (Pl. Br. Ex. 29). However, as Defendant admits, although the EEO Guidelines specify that the background and reference forms together account for 40% of a candidate's final score, the background check ratings were not taken into account in this case.

Plaintiff further argues that a reasonable inference of discrimination stems the fact that White's interview scores increased dramatically from his rankings in connection with the Oaks and Muskegon/Alger positions in December 2004 and February 2005 respectively to his May 2005 scores. In December 2004, the interview panel consisting of Straub, MacMeekin, Wolfe, and Bock gave him one VG and 5 Gs. (Pl. Br. Ex. 25). In February 2005, the interview panel consisting of Straub, MacMeekin, Bock, and Wolfe gave White six Gs. (Pl. Br. Ex. 26). However, the April 2005 interview panel of MacMeekin, Bridgford, Straub, and Wolfe gave White four Os and one VG. (Pl. Br. Ex. 27).[5]

[5] Plaintiff's interview panel rankings also varied from interview to interview. In December 2004, Plaintiff received one VG, four Gs, and one A. (Def. Br. Ex. 7). In February 2005, Plaintiff received two Gs and four As. (Pl. Br. Ex. 14). In April 2005, Plaintiff was scored with five Gs. (Pl. Br. Ex. 21).

Defendant argues that since the Ojibway position only had six applicants, White simply just

Defendant attempts to respond to the variance of interview scores with a variety of speculative arguments: (1) the interview scoring is "relative" to the performance of the other candidates in the interview (Bock Dep. 15; Bridgford Aff. ¶ 11; Straub Dep. 14-15); and (2) candidates can take interview training sessions or could learn from their experiences to obtain better ratings. (Bridgford Aff. ¶ 10). Neither of these contentions are supported by any specific evidence. Furthermore, Defendant provides no specific explanation for how or why White's interview scores dramatically improved relative to the other candidates.

Plaintiff next maintains that since the selection criteria and their relative weight by the Ojibway and Pine River positions "bear almost no relation to the essential duties and their respective importance, . . . . the evidence permits the inference that the criteria were purposefully tailored, not to match the Position Descriptions, as required by the EEO Guidelines, but to match the perceived strengths of the desired candidate." (Pl. Br. 8). The Court notes that Plaintiff is correct that the interview panel criteria for the Ojibway and Pine River positions do not match the original job position descriptions, as they did for the Oaks, Muskegon, and Alger positions.

could have performed better than the other five candidates vying for that position. However, an examination of the candidate pools between the Muskegon/Alger positions and the Ojibway/Pine River positions supports Plaintiff's argument that White's meteoric rise in scoring in the intervening two months lacks a legitimate explanation. For the Muskegon/Alger positions, for which White scored straight Gs (a mid-range-to-low score), sixteen candidates were in the pool, with eleven candidates for the Muskegon slot and eleven for the Alger slot. Candidates Edlund, Luetzow, McQuiggin, and Quigley, the other four candidates for the Ojibway position (the other two being White and Plaintiff), had also applied exclusively for the Alger position. The panel interviewed for the Muskegon/Alger position at the same time and selected Bergh and Harry, who had applied for both positions. Taking Bergh and Harry out of the Alger candidate pool leaves Edlund, Luetzow, McQuiggin, Napel, Quigley, Ray, White, and Plaintiff – six of whom comprised the candidate pool for the Ojibway position. White received all Gs for the combined Muskegon/Alger position, which would probably have put White in the mid-to-lower tier of the sixteen candidates. In order to assume that White did not miraculously leap-frog the other five candidates for the Ojibway position, the five other candidates for the Alger position, including Plaintiff, would have had to have generally ranked near the bottom of the sixteen applicants.

Plaintiff additionally argues that White's previous serious disciplinary record from 1994 was not considered in connection with his Warden application. Defendant responds that its own guidelines do not permit it to consider incidents of discipline that occurred more than two years previously, unless the candidate incurred additional discipline or corrective action during that two-year period. (Bridgford Aff. ¶ 21).The Court finds that the MDOC Guidelines, that include burying assaultive on-the-job conduct against inmates from consideration with regard to future job promotion considerations, are not reasonable, and lend support to the likely conclusion that Defendant wants to be able to reach the result it wants, preordained or otherwise, without regard to any objective standards.

Finally, Plaintiff testified that interviewer Wolfe, the only African-American on the interview panel, appeared to fall asleep during the final third of Plaintiff's interview for the Ojibway and Pine River positions:

Q:    When you say you appeared to fall asleep, what brings you to this conclusion?

A:    He folded his arms across his chest and closed his eyes and leaned back in his chair.

Q:    How long did he do this for?

A:    I'd say probably the last third of the interview, so probably seven or eight minutes, ten minutes.

Q:    Did you mention to the other people in the interview panel that he appears to be asleep?

A:    No.

Q:    Did any of the other interviewers mention it?

A:    No.

Q:      And how does this show that race was a factor in the decision regarding these warden positions?

A:      The Pine River facility is under his jurisdiction so he would so he would be the primary person to make the selection for that position. And the fact that he would fall asleep during my interview when I was answering questions was indicative of a person that had no interest in hearing what I had to say. The person subsequently chosen was black that's all.

(Howell Dep. 69:21-25, 70:1-23).

Defendant responds that the other interviewers present challenge Plaintiff's contention that Wolfe was sleeping during the interview. (Bridgford Dep. 49:7-12; Straub Dep. 30:21-25, 31:1-7; Def. Br. Ex. 29, MacMeekin Dep. 43:23-25, 44:2-5; Def. Br. Ex. 31, Wolfe Dep. 43:20-25, 44:1-5). Viewing the evidence in the light most favorable to Plaintiff, if Wolfe fell asleep for a significant portion of Plaintiff's interview, that would be admissible evidence in Plaintiff's case – in particular since the interview counts for 60% of the total scoring.

For the foregoing reasons, the Court holds that Plaintiff has succeeded in demonstrating that Defendant's stated reasons for the relevant employment decisions are mere pretext. Plaintiff's proffered direct and circumstantial evidence, combined with the complete subjectivity of the determinative interview process, creates a genuine issue of material fact as to whether Defendant discriminated against Plaintiff on the basis of his race.

Indeed, the Court finds Defendant MDOC's Warden promotion procedures to be totally subjective; the procedure enables MDOC to predetermine the outcome. There is so little merit built into the system that it amounts to no valid system at all. The system is designed to let MDOC reach the result it preordains, even if this is in violation of the law.

As to Plaintiff's claim of discrimination based on sex, the Court holds that Plaintiff has not shown pretext for this claim. First of all, as outlined above, the brunt of Plaintiff's proffered

direct and circumstantial evidence address the race discrimination issue. Second, Plaintiff has admitted that he was "at least as equally qualified" as Harry for the Muskegon position. (Compl. ¶ 10). In short, the Court does not find adequate evidence in the record to support that Defendant impermissibly discriminated against Plaintiff on the basis of sex.

Accordingly, the Court GRANTS Defendant's Motion for Summary Judgment on Plaintiff's Title VII sex discrimination claim; and DENIES Defendant's Motion for Summary Judgment on Plaintiff's race discrimination claim.

### D.     State Law ELCRA Claims

Counts III and IV of Plaintiff's Complaint allege violations of Michigan's ELCRA. Michigan ELCRA claims are governed by the same burden-shifting analysis as federal Title VII claims. *Jackson,* 191 F.3d at 658. Hence, for the foregoing reasons, the Court GRANTS Defendant's Motion for Summary Judgment on Plaintiff's ELCRA sex discrimination claim; and DENIES Defendant's Motion for Summary Judgment on Plaintiff's ELCRA race discrimination claim.

### III.     CONCLUSION

For the foregoing reasons, the Court hereby:

(1)     **GRANTS** Defendant's Motion for Summary Judgment on Plaintiff's Title VII sex discrimination claim;

(2)     **GRANTS** Defendant's Motion for Summary Judgment on Plaintiff's ELCRA sex discrimination claim;

(3)     **DENIES** Defendant's Motion for Summary Judgment on Plaintiff's Title VII race discrimination claim; and

(4)     **DENIES** Defendant's Motion for Summary Judgment on Plaintiff's ELCRA race discrimination claim.

**SO ORDERED.**


                                    s/Paul D. Borman
                                    PAUL D. BORMAN
                                    UNITED STATES DISTRICT JUDGE

Dated:  September 7, 2007

                         CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on
            September 7, 2007.


                                    s/Denise Goodine
                                    Case Manager